No. 12755

IN THE SUPREME COURT OF THE STATE OF MONTANA

1975

---

SAM TURLEY,

Plaintiff and Respondent,

-vs-

THE MONTANA POWER COMPANY,

Defendant and Appellant.

---

Appeal from:   District Court of the Eighteenth Judicial District,
               Honorable W. W. Lessley, Judge presiding.

Counsel of Record:

   For Appellant:

        Morrow, Nash and Sedivy, Bozeman, Montana
        Edmund P. Sedivy argued, Bozeman, Montana

   For Respondent:

        Berg, Angel, Andriolo and Morgan, Bozeman, Montana
        Richard J. Andriolo argued, Bozeman, Montana

---

Submitted:  April 8, 1975

Decided: MAY - 8 1975

Filed: MAY - 8 1975

Thomas J. Kearney
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

Defendant Montana Power Company brings this appeal from a judgment entered in a personal injury action in the district court, Gallatin County, in favor of plaintiff Sam Turley. Three additional defendants, William H. Heiser, Sigrid M. Burrell and Wallace McHenry were originally named, but were dismissed midtrial on their motion without objection of plaintiff. The jury awarded plaintiff damages in the amount of $30,000. Defendant appeals from this verdict and judgment.

Turley was an employee of the Big Sky Model Homes of Livingston, Montana, when he received serious injuries while working on the roof of a Big Sky Home belonging to one Sam Heiser. He came into contact with high voltage wires which passed over the roof of the Heiser home.

The home in/question was purchased by Heiser in October 1970, from a business known as Premier Homes, a dealer for the Big Sky brand mobile homes. On October 26, 1970, Premier Homes moved the mobile home onto property owned by Wallace McHenry, at a location known as the four corners area in Gallatin County. The McHenry property consisted of about three acres and was principally used by McHenry to operate a grocery store and a filling station. There were a number of trailer parking areas on the acreage which had been used many years before and McHenry in 1969 allowed Heiser, his brother-in-law, to set up his mobile home on the property. When he sold his original trailer on the site, Heiser was permitted to move a new one on the acreage. The original trailer was 55 feet long, the Big Sky trailer was 66 feet long.

In approximately 1954, defendant Montana Power Company constructed an electrical transmission line running north and south across the property now owned by McHenry. The poles for the lines were located along the property fence lines. One pole was at the north end of the fence line, along with several other poles constituting a switching station. The pole at the south end of the property was some 290 feet from the north end pole. At the time of this construction the Power Company received two right-of-way easment deeds, one 50 feet in width, for the operation of its lines.

While there is disagreement on whether the original Heiser trailer was under the power lines, there is no question but that the Big Sky trailer was some 11 feet under the lines. The power lines were originally constructed at a height whereby the lower four lines transmitting 7200/12470 volts, known as the 12 KV system, were seventeen feet, six inches from ground level. The upper three wires, transmitting 50,000 volts, were higher. This height was well within the National Electric Safety Code.

After the Heiser Big Sky trailer was moved under the lines the lower four lines, the 12 KV lines, extended only five feet, seven inches over the roof of the trailer. The upper lines were eight feet higher. The National Electric Safety Code prescribes that the clearance height over buildings be constructed at a minimum height of eight feet, and with the length of the span here, the height should have been nine feet, four inches.

At the time of moving the trailer onto the property, no one notified Montana Power Company that the trailer was being moved under its lines; nor did anyone ask to put the trailer on its easement. Premier Homes personnel did all of the necessary sewer and electrical hook-ups, when it moved the trailer onto the site.

Immediately after setting up the Big Sky trailer, Heiser began having problems with it and he requested Premier Homes to

come out and fix the deficiencies he had found--such as carpeting, panelling, plumbing, the water system, the floor and windows. Premier Homes passed/these complaints on to Big Sky Company at Livingston and Turley was sent out by the company to fix them. He first arrived there on November 5 and worked that day through the 7th, making necessary repairs. After a weekend, he returned on the 9th, arriving about 1 p.m., to fix the roof. On that day he was accompanied by another Big Sky Company employee, a Mr. Sparr.

Turley testified he and Heiser went up on the roof of the trailer where Heiser pointed out the problems he saw on the roof. Turley decided that it would be necessary to seal the roof to prevent leakage, Heiser agreed this would be satisfactory. At the time the men were on the roof Turley observed the wires running over the trailer and was aware they were high voltage wires.

Following the roof inspection the two men went down off the roof and Turley worked with his co-employee for an hour or so fixing windows. During this time, he testified, he again observed the power poles and the wires above him. Turley then took his roof repair equipment and went back on the roof and began applying sealer to the roof. At that time he again observed the wires, but did not think they would bother him, even though he is six feet,three inches tall and the wires were only five feet, seven inches over the roof. Sometime during this period his forehead came into contact with the most easterly transmission line resulting in severe injuries.

Appellant Power Company raises six issues on appeal, however due to our finding that issue one, the failure of the trial court to grant defendant's motions for dismissal and a directed verdict, is controlling, only that issue will be discussted herein.

Appellant Power Company and respondent Turley recognize that issue one is the controlling issue and devote much of their argument to this point.

Appellant relies on a recent opinion of the Court, Sprankle v. DeCock, _____Mont._____, 530 P.2d 457, 459, 460, 31 St.Rep. 437, and authorities cited therein as controlling.

Respondent Turley argues that this is a case where the Court must consider the evidence in a light most favorable to the party against whom the motion is directed and that every reasonable inference to such evidence will be given in that party's favor. Also, that a cause should never be withdrawn from a jury unless the conclusion from the facts necessarily follows as a matter of law that recovery cannot be had on any view which can be reasonably drawn from the facts which the evidence tends to establish. Parini v. Lanch, 148 Mont. 188, 418 P.2d 861; McIntosh v. Linder-Kind Lumber Co., 144 Mont. 1, 393 P.2d 782.

Respondent cites three Montana cases, Mize v. Rocky Mountain Bell Telephone Co., 38 Mont. 521, 100 P. 971; Bourke v. Butte Electric & Power Co., 33 Mont. 267, 83 P. 470; and Farnum v. Montana-Dakota Power Co., 99 Mont. 217, 43 P.2d 640, in support of his position that because/appellant was in violation of the standards set by the National Electrical Safety Code as to the height from the roof of the trailer to the wires, it cannot escape liability by pleading it did not know of the violations. Respondent argues there was a legal duty on the part of appellant to inspect its lines and to know when they crossed places of habitation. Anderson v. Northern States Power Co., 236 Minn. 196, 52 N.W.2d 434, 439.

We have carefully examined the authorities relied upon by respondent and find them either factually not applicable here or not controlling law in view of Montana's most recent case on point, Sprankle.

From all the evidence there can be but one conclusion, that respondent failed to use reasonable care under the circumstances. He acknowledged he had observed the wires while on the ground, that he was aware they were high voltage lines, and yet he either walked into one or straightened up from his sealing job and contacted one of the lines. According to all testimony, there was nothing obstructing his view. One of respondent's witnesses testified as to what a reasonable standard of care would be under the circumstances and respondent failed in all regards to this standard propounded by Mr. Pierce, his own witness. Pierce testified a repairman, doing a like job, should have thoroughly checked the wires to determine their type and if there was any question then he should have checked the wires and poles from different angles and should not have proceeded with his work until this was done. He further testified a repairman should keep his eyes on the wires while working and not risk any chance on their height, and in every way he should keep a lookout for his own safety.

Considering respondent's argument with respect to the minimum clearance standards of the National Safety Code, appellant argues that originally the power lines exceeded the minimum standards of the code in that they were seventeen feet, six inches from the ground to the lowest wire; that it had obtained right-of-way easements for its lines and poles and no one had ever requested permission to move a mobile home onto the easement, nor did they notify appellant of the proposed move. Moving the mobile home onto the easement created a code clearance violation which some fourteen days later led to the injury of respondent. Noting respondent's reliance on Anderson on the duty to inspect, appellant cites this from the same case:

> "* * * but such inspection is intended primarily for the purpose of discovering and correcting defects in its lines or its apparatus. Here, the accident was not the result of defective lines or apparatus, but, instead, resulted from the creation of a dangerous

condition by the act of a third party in changing that which had been safe to something which became dangerous by the erection of a structure which brought people into close proximity with the dangerous lines where people had not been expected to be before. The evidence in this case does not warrant a finding of negligence based on a failure to inspect."

In the instant case, as in Anderson , which was a nearly identical fact situation, it hardly seems reasonable for anyone to find that a duty existed, let alone a breach of duty. But these questions are really moot in view of the law of Montana as recently expressed by this Court in Sprankle. In Sprankle the trial court refused to submit the case to a jury and granted summary judgment. This Court on review stated:

"Much of plaintiff's argument before us concerns the various legal theories and evidentiary basis upon which a jury might find that either or both of the defendants were negligent in the performance of a duty owed plaintiff. This argument becomes moot in the face of the undisputed facts which establish plaintiff's own negligence contributing as a proximate cause of his injuries.

"Our law requires all competent capable persons to exercise ordinary care for their own safety, George v. Northern Pacific Ry. Co., 59 Mont. 162, 196 P. 869. Ordinary care has been defined as that degree of care an ordinarily prudent person would exercise under like circumstances to avoid injury. Restatement Second, Torts, Negligence §462-3; Prosser on Torts, 4th Ed., §65, 416-17; Stevens v. Waldorf-Hoerner Paper Co., 149 Mont. 306, 425 P.2d 832. This has been held to include the duty to make reasonable use of one's faculties to observe and avoid conditions of obvious potential danger, Pickett v. Kyger, 151 Mont. 87, 439 P.2d 57. "

The Court then concluded:

"Viewing the plaintiff's evidence in the light most favorable to him it is susceptible of but one conclusion--he climbed onto a farmhand loader and hoisted a long metal pole into contact with high overhead power lines which were clearly visible, which he had lived and worked around for eight years. While admittingly knowing any electrical line was dangerous he did not exercise ordinary care for his safety under the circumstances, which failure proximately caused his injuries."

In Sprankle, as here, the controlling question turns on the matter of proximate cause and evidence as to whether the injured party exercised ordinary care for his own safety to avoid coming

in contact with the power line. In _Sprankle_ the Court found that plaintiff's own negligence was a proximate cause of his injuries. The same can be said in the instant case. Here, respondent although aware of the high voltage lines, somehow came into contact with one of them and in so doing he failed in his duty to reasonably use his faculties to observe and avoid obvious danger. This negligence was the proximate cause of his injuries.

Respondent argues _Sprankle_ can be distinguished because here there is a safety code violation. Even granting his argument, this is not a valid distinction for in _Sprankle_ the Court was willing to concede defendant's negligence, but held that this point was moot because of plaintiff's own negligence being or contributing as a proximate cause of his injuries. Accepting respondent's argument, the same is true in the instant case.

The judgment of the trial court is reversed and the cause dismissed.

_John Conway Harrison_
Justice

We Concur:

_Jean S. Daly_

_Frank J. Haswell_

_Wesley Castles_
Justices

_Gardner Brownlee_
Hon. E. Gardner Brownlee, District Judge, sitting for Chief Justice James T. Harrison.

- 8 -